Next case is Tyler Copeland v. Georgia Department of Corrections. Kenneth E. Martin III is here for the appellant Copeland. Jason Lee is here for the amicus. And G. Todd Carter is here for the Georgia Department of Corrections. And Mr. Barton, you may begin when you're ready. Good morning, Judge Wilson, Judge Fryer, Judge Brasher. I'm Ken Barton. I'm here with Tyler Copeland, who's in the courtroom today. For context, a brief factual background of this case. When Tyler Copeland, who is by all accounts a good employee of the Georgia Department of Corrections, attempted to have his personnel file to reflect his legal name change, his employer, GDC, told pretty much all of Lieutenant Copeland's co-workers that he identifies as transgender. And nearly every day after that point, for a period of 15 months at least, numerous colleagues and supervisors refused to respect the fact that Lieutenant Copeland identifies as male. They referred to Lieutenant Copeland as female over the prison-wide radio. One supervisor routinely called him baby girl. And Lieutenant Copeland felt dehumanized when he was referred to as the terms it and that. Well, let me add, you got seven minutes there. And so we're familiar with the background and the facts in this case. And I would imagine that your strongest argument is the hostile work environment claim. But with regard to the failure to promote claim and the retaliation claim, how does he establish that he suffered an adverse employment action if he was ultimately promoted in 2020 to lieutenant? Yes, Your Honor. And it's very important to point out that it's not just about the failure to promote. Lieutenant Copeland's retaliation claim was based on a number of materially adverse actions that occurred to him. As this court is aware, a retaliation claim to be proven, you have to be engaged in a statutorily protected activity, which I do not believe was disputed by GDC in this case. Lieutenant Copeland brought forth several materially adverse actions that he believed were discriminatory and specifically retaliatory. And that would include the failure to promote. So he got the job. Your argument is that there was a delay in him getting the job? Yes, Your Honor. The promotions were delayed. I believe Lieutenant Copeland applied for promotions on four or five different occasions, as the record reflected, as well as for a lateral transfer to another facility. But it went beyond that. It also went to retaliation. I haven't seen a case where a failure to promote, where you got the job, was based on delay. You have a case? I do not at the moment, Your Honor. I believe that might be addressed in the briefs. Okay. All right. Why don't you tell us about the hostile work environment claim? I'm sorry? The hostile work environment claim? Yes. And I believe that the United States, as amicus, is going to discuss this further. But the district court certainly erred on dismissing Lieutenant Copeland's hostile work environment claim, as it should have been found that he established, at least on summary judgment, all of the necessary elements. As the court is aware, an individual has to show that they belong to a protected group. They are subjected to unwelcome harassment. That harassment is based on a protected characteristic, as the first three factors. Those were not instituted by GDC in this case. And so, Lieutenant Copeland should have been seen as having established each of those factors. I guess the most critical factor, it seems to me, just speaking for myself, is whether or not the harassment was so severe and pervasive as to adversely affect the conditions of his employment. So how does it affect the conditions of his employment? He got the job. He got the promotion, right? Yes, Your Honor. And where is there evidence that his supervisors didn't do something to correct the harassment? Once they determined that there was harassment, they took steps to correct it? Your Honor, they did not take action. And, Your Honor, as this court is aware, whether the treatment was sufficiently severe and pervasive, there's both an objective and a subjective component of that part of the claim. And it's important that these claims are not Here, Lieutenant Copeland was employed as a correctional officer and supervisor at a prison. And as the United States, I believe, will explain in additional detail, the treatment that he received specifically put Lieutenant Copeland at risk. If I can go back to the subjective factor, there was actually evidence in the record. I know the district court zeroed in on some notes, a journal that Lieutenant Copeland kept. But there's one note where Lieutenant Copeland specifically said, as the harassment was occurring, that he was concerned about how this was affecting his employment and how it was impacting his ability to be both a correctional officer and a supervisor in the workplace. Can I ask you a question about that? So, it seems, one odd thing about this case to me, and correct me if I'm wrong, but it seems like Lieutenant Copeland was a supervisor of some of these people who were doing the harassing. And that's very unusual. We've said in workplace harassment cases that when your supervisor is harassing you, that's particularly severe. Would it make sense to say the opposite, that if your subordinates are harassing you, then it's not particularly severe? It seems odd to me that if you're the lieutenant, and I forget the position before lieutenant, but there was that, that, you know, you're in a position to stop people from harassing you. You're the sergeant or the lieutenant. What do you say about that? That's correct, your honor. And Lieutenant Copeland's supervisors told him what to do in the situation if his subordinates were harassing him. And that's exactly what Lieutenant Copeland did. He addressed his shift. He asked him respectfully, please refer to me simply as my, as my title. If you don't want to use my title. It was later his, his own supervisors who came back and said that he was infringing on his subordinates' religious liberties. And so while I wouldn't necessarily say that that form of harassment from subordinates would be quite as bad as that that Lieutenant Copeland experienced from his supervisors, I think it plays into the hospital. Can you answer another question for me about, just about the record? So there's a, there's a lot of talk in the, in the briefs about the radio traffic. So I've been in prisons before. I'm familiar. Everybody walks around with a walkie talkie, right? And you hear sort of traffic back and forth. And there's arguments in the record about referring to Lieutenant Copeland as ma'am on the, over radio traffic. Could you just explain that to me? Are these people talking to each other? Are they talking to Lieutenant Copeland? What's the deal with like the number situation where you can refer to people as like L2R? Could you just explain that to me? Yes, your honor. It's my understanding that this occurred both directly to Lieutenant Copeland, but also in conversations about him over the radio. The record reflected that it was standard at Georgia's, or I'm sorry, at the prison in Reidsville to use the call signs as your honor mentioned. I believe Lieutenant Copeland's was L for Lieutenant and maybe B1 if I recall correctly. And so it was standard not to use pronouns at all for any employee. And so just explain that. So when I'm, when you're talking to someone, you wouldn't use it when you talk about them. I just don't understand like what, what, what you mean by that? It's my understanding the record would reflect that, that neither, that call signs were used both in referring to a co-worker or in speaking directly to them. And these are things, as I think your honor recognized, that all other employees would be able to hear throughout the prison, but not just the employees. I think it's important to note that there are inmates there as well. And so as we argue throughout the briefs, this specifically caused a risk of safety to Lieutenant Copeland. And so it's our belief that. So where does the ma'am come in? Where does, who, who is, who is speaking to who? That's what I'm kind of confused about. Because I wouldn't, if I'm speaking about someone to someone else, I wouldn't use ma'am or sir or anything like that. Could you just explain that to me? If I recall correctly, those were the comments that were made directly to Lieutenant Copeland. Okay. People who knew who he was, knew what he had requested to be referred to, you know, in person and over the radio. And that the ma'am comments would have been those made directly to. So these wouldn't be people talking to each other over like a open radio. These would be people talking to Lieutenant Copeland. They would be both, your honor. Would they be supervisors? Yes, your honor. Supervisors and co-workers, including subordinates. That's correct. And as I mentioned, these are things that not just the employees of GDC, but also the inmates would be able to hear as well. And so how many, I mean, in the record here, how many times are we talking about? According to the district court, it was 17. The district court used that journal that I mentioned, the notes that Lieutenant Copeland kept for a short period of time and counted 17 instances of harassment. However, the record reflected that this was occurring on a near daily basis. Whether it was the simple misgendering, whether it was the baby girl comments, comments about Lieutenant Copeland's genitalia, it happened nearly every day. That's what he said in his deposition? That's correct, your honor. Just one point of clarification. Are you claiming that the transfer to less desirable shifts is part of the retaliation claim? Yes, your honor, we do. And that was specifically alleged in the complaint. So the failure to promote, the refusal to transfer Lieutenant Copeland to another facility, also moving Lieutenant Copeland to a less desirable shift, but also the increase of harassment as well as threatened and actual discipline that Lieutenant Copeland received. Yes, your honor, that's all part of the retaliation claim that was denied, but also not considered by the district court below. Thank you. And so we believe that this is one of those cases that the district court failed to apply the standards, viewing the record in Lieutenant Copeland's favor, and that it should be reversed and remanded for a jury trial. All right. Thank you, Mr. Barton. Mr. Lee, you're here for the amicus. May I please the court, Jason Lee for the United States. This court should reverse because a jury could reasonably find that Copeland's work environment was objectively hostile. The misgendering here was personally hurtful, it was publicly humiliating, and it was professionally damaging. It impeded his ability to do his job, it potentially jeopardized his physical safety, and it eventually culminated in physically threatening conduct by a co-worker. A jury could reasonably find that this was precisely the type of hostile work environment that Title VII prohibits. Now, Judge Brasher, you asked earlier whether or not the fact that you had people up and down the chain of command participating in the misgendering, whether or not that makes this conduct more severe. Yes, it does. Because not only do you have supervisors modeling misgendering behavior, suggesting that this is acceptable, and even a jury could reasonably find fostering insubordination, but you had that type of misgendering happening in front of subordinate officers and new hires. And the message that sends is, this guy's a joke. You don't have to take this guy seriously. Now, especially in a correctional context, that makes this type of conduct more severe. As the Second Circuit in Dawson explained, correctional officers, including supervisors, they have to be able to depend on their subordinate officers, their co-workers for mutual protection, that if a potentially dangerous situation arises, they'll have their back. And that is exactly the type of thing that Copeland here, with the type of behavior that was being modeled, couldn't depend on. Let me ask you this about the subordinates. You know, I mean, in a prison setting, you've got basically sort of a military style hierarchy. I mean, right, you're a sergeant, a lieutenant, you have people who report to you. Why isn't it reasonable for the employer to say, look, if people are, you know, if they're mistreating you, it's your responsibility as their commanding officer, their supervisor, to do something about that yourself. Why isn't that a reasonable response to the subordinate problem here? He did. As described in Copeland's testimony, he did try and address this type of behavior with his shift, and that was entirely reasonable for him to do, especially given that initial directive from HR, from the Human Resources Department at the prison, was, you refer to this person as Sergeant Copeland, or you use male pronouns. So he did try and address it with his subordinates on his shift. He also contacted his supervisor. He contacted an HR assistant. He brought it up with the warden. He contacted the employee assistance program. Now, under this court circuit, when you have a case law, when you have those type of efforts to address the issue with the supervisor and it's not remediated, that makes the conduct more severe. But beyond the severity of the conduct, of course, you do have the other factors that a jury could reasonably find are checked off here. You have publicly humiliating conduct. You have conduct that interferes with his ability to do his job. You have kind of undisputed from the other side, physically threatening conduct. All of that would suffice here for a reasonable jury to find objective hostility. Of course, you also have other evidence. Let me ask you kind of a broader question because you're here from the government to help. So, you know, one of the issues that it seems like the prison is dealing with in this situation is they have some people who, I think in Sergeant Copeland's words, object to my lifestyle or didn't agree with my lifestyle. What are employers supposed to do with balancing, I mean, let's say people of religious faith who disagree with a particular lifestyle versus transgender folks? I mean, Title VII applies to both of these groups. Well, what are they supposed to do about that? You know, one possibility is to do exactly what the prison officials tried to do here, which was provide a gender neutral way for officers to refer to supervisors. You use their last name and their title, Sergeant Copeland. You use their gender neutral call sign, L1B. So that's one possibility was offered here. And what that meant is those conspicuous uses of the word ma'am, baby girl, it, they were completely unnecessary. There was a gender neutral way that they typically did and could have here referred to their supervisors. And because it was not used, it made it all the more obvious that the intent was, the intended effect was to humiliate Copeland and undermine his authority as a supervisor. These are the types of workplace harms that under Title VII, when it's inflicted through sex-based harassment, which is not disputed, that the employee doesn't need to put up with. And crediting Copeland's testimony, especially in the absence of any contradictory evidence put forth by the defendant, in the absence of any contradictory evidence, a jury could have accepted the account of what happened and reasonably found all four of the factors met here. So unless this court has any further questions, which I'm happy to answer either way. Let me ask you, I still don't really understand the radio stuff. Do you understand the, so I mean, the use of ma'am was someone communicating over the radio directly with Sergeant Copeland. That's what that is. My understanding is that it happened both ways, as plaintiff's counsel mentioned, that not only was it supervisors talking about Copeland, but it was statements to Copeland. And some of those statements would So instead of saying, I'm heading over to the Westgate, understood ma'am. Now in that context, there's no need to append the word ma'am. You can say understood, understood L1B. L1B is headed over that way. And so, oh, I'm sorry, didn't mean to interrupt you, but so those communications would be heard by others because it was on a handheld radio or a walkie-talkie or some device like that? Is that the, is that what the record shows? That's correct. And in fact. And how many times in the record? It was, it was daily. What Copeland said was it happened by three to four individuals each workday. He just, he specifically named 22 individuals who participated in the misgendering, three supervisors, a lieutenant, a captain and two lieutenants and 19 subordinate or coworkers. And he said on average, it would happen by three to three to four persons per workday. And to answer your question about the radio, yes, it was audible every time the word ma'am was used by a coworker. And in fact, there was, there was testimony that at times when someone would use the word ma'am, other officers would use their radio to transmit their laughter in response, making very clear that everyone understood this was an obvious conspicuous attempt to ridicule Copeland. In fact, it went so far that Copeland's named a cafeteria worker who also participated in the misgendering. That is how far this practice went. Let me ask you one last question. So what about the fact that Copeland was promoted? You know, that's also an unusual thing. I mean, the standard for hostile work environment is so high. I mean, you have to show that the harassment affected the basics of your employment. And it's very rare that someone comes in and says, yeah, there was all this harassment. And by the way, I got a better job and got promoted. What do we do with that? The promotion took place almost half a year after Copeland contacted or filed his EEOC complaint. The EEOC complaint was filed in September 2019. And I believe Sergeant Copeland was promoted in April 2020. So this is almost six, more than six months after the fact. And if anything, the fact that he was promoted is testament to Copeland's perseverance to be able to successfully do his job, despite the fact that you had people up and undermining his supervisory authority. All right. Thank you, Mr. Lee. Mr. Carter. My name is Todd Carter from Brunswick, Georgia. I represent the Georgia Department of Corrections in this Title VII lawsuit. Obviously, you've pointed out two issues, whether there was a hostile work environment that violates Title VII and whether there was a retaliation claim based on a failure to promote. With regard to the second issue first, the failure to promote, there are two reasons the trial court should be affirmed on that. Number one, Tyler Copeland got the promotion. He was promoted to lieutenant. He applied. I think he testified in his deposition four to five times. He also doesn't know who the decision makers were that made the decision. He doesn't know whether they were aware of any of this or not. He said it was pure speculation. That's exactly the way he testified to it in his deposition. So with regard to the Title VII retaliation failure to promote claim, I think it's clear. Why can't a failure to promote claim be based on a delay in the failure to promote? Well, again, I'm not aware of a case that states that. There was certainly none cited that I saw in the plaintiff's brief. The U.S.'s amicus hasn't taken a position on that issue, so I'm not aware of a delay. He also testified in his deposition and tried to rely on a bunch of jobs that he applied for that were outside of the department, but we had no control over that, obviously. He, again, didn't know anybody that had spoken to any of these outside employers or tried to influence them in any way. So, ultimately, he got the job. He was promoted to lieutenant and he worked there until he was heard, I believe. So, again, I believe trial court properly decided the second issue and should be affirmed. Now, with regard to the hostile work environment, the trial court found that it was not objectively severe and pervasive, the harassment. The trial court relied on the 17 incidents that he described in Mr. Copeland's, that Mr. Copeland testified to in his deposition, and I asked him specifically in his deposition because he would make comments about this was frequent, this was, you know, all the time. And so, I pinned down, I said, when you sat down and prepared this list, the purpose of preparing it was to document what you contended to be harassment on the job, correct? Yes. And so, when you sat down and did it, you tried to put down everything you could remember, correct? Yes. And you were much better at that time to remember everything that occurred between September 10, 2018 and September 4, 2019 than you are here talking to me today, correct? That is correct. All right. So, exhibit two is a more comprehensive list of what you actually, what actually occurred between September of 2018 and September 2019, correct? That is correct. That's what the trial court looked at and it's described, it's in the record motion for summary deposition. He didn't say in his deposition that this harassment took place on a daily basis? He testified to that, which is why I tried to pin him down as to, you know, what it did. And there are a couple of mentions in there about the ma'am. The ma'am comment is mainly what was taking place. The department, once he transitioned, the department had a meeting with everyone at the firm. They recognized, you know, the issue, so they directed the employees to use male pronouns. Now, you know, there's evidence and he testified, obviously, that he was referred to as ma'am. But, again, over the period of one year, referencing someone, that's not an inherently offensive term. Let me, I want to go back to the deposition testimony you were talking about. Because in the transcript, when you first begin talking about Exhibit 2, which is a list of incidents, on page 37 of the deposition, you say, you asked, was the purpose of this document to write down all of your allegations of harassment or retaliation or what have you that occurred between those two dates? And the answer was, this document is a compiled list of the major incidents that took place. However, it is not a full summary of all the harassment that took out of this document is the constant radio traffic that was used in a harassing manner on a daily basis. That's right at the beginning of your examination, isn't it? That's on page 37. And the part I was reading from is on page 50, where I went back to try and pin him down on exactly what this exhibit was and what it was that he was complaining about. He makes reference in the exhibit that the court relied upon about radio traffic. But he never testified in his deposition that it was every single incident that was reported in that document. As I read the deposition, did he? He testified on page 50. You sat down and you tried to put down everything you could remember, correct? Yes. And you said you were a little better trying to remember what occurred at that time than talking here to me today. That is correct. So Exhibit 2 is a more comprehensive list of what actually occurred between September of 2018 and September 2019. Correct? That is correct. Throughout the deposition, I see references to this radio traffic occurring on almost a daily basis. And he says that it happened so often that he couldn't document it all. That's in the deposition, isn't it? It is. He did testify to that. Again, that's what I'm saying. I was trying to pin him down because it was a little bit inconsistent. And that's where he mentioned that. The main part of the radio traffic was being referenced as ma'am. And with regard to that, the plaintiff's brief in this case on page 19, they say, had the harassment merely consisted of Copeland being referred by colleagues as ma'am or she and being confronted by a co-worker who said she was proud to be a female, the district court's conclusion may have been correct. So it seems to me that the plaintiff has admitted that these weren't inherently offensive comments. Now, the trial court, again, what the trial court looked at was the four things you look at at the time and whether something is objectively severe and pervasive enough to the frequency. The trial court said it happened 17, there were 17 incidents over the one-year period. He compared that to the Guthrie case, said that simply. Well, there's some other cases. I mean, the cases are all over the place. And so, I mean, we've got Jones, just seven documented instances in one year were sufficiently frequent. So, I mean, the issue here is whether a reasonable jury could determine whether or not, you know, these instances over the course of a year were sufficiently severe and pervasive. It seems to me that he has a strong argument that, I mean, you can, why can't you use your deposition to cross-examine him at a trial and have the jury make that in a light most favorable to Copeland? But again, you know, frequency is only one part of what the court looks at. And the courts have said you have to look at the totality of the circumstances. Frequency, severity, whether it's physically threatening, and whether it affects their job performance. Now, they make comments about, you know, that it's in a prison, you know, that it could have affected his work, but there's no evidence of that. Were there some physical contact? There was one. There were two instances of physical contact. One that involved Officer Holland, who pushed him on his shoulder, made the comments, we could fight. That was investigated by the department. Officer Holland and Lieutenant Copeland were friends. They joked a lot. They investigated this incident. There were witnesses that testified that it was not in a hostile manner. There was no... So the district court accepted the results of the investigation on summary judgment. Isn't that in violation of the summary judgment standard? I think he pointed that out as evidence in the record, that it was, you know, that that's what the investigation determined. But I don't believe there was any evidence offered by plaintiff to dispute that that's what occurred. I don't believe the plaintiff came, there was no affidavits filed or anything else saying that I felt physically, you know, threatened by this. What about the... The district court didn't discuss the incident in which the employee circled in a vehicle, circled, drove around Mr. Copeland in a vehicle with, in a threatening manner. Tell me about that incident. They were in the parking lot and she drove, she was driving around the parking lot looking at him and he said that she was armed. I guess all the prison guards would be armed in this situation. But there was nothing other than driving around and staring. So I don't know that that could be, you know, deemed as physically threatening. Was there another explanation in the record for that conduct? There was no explanation other than that she was circling, just driving around and looking at him. And there was no indication as to how long this occurred or anything else. But an employee driving around in the parking lot looking at somebody, that's not physically threatening. Was this Holland? I'm sorry? Is this Holland? Yes, Your Honor. Was Holland's deposition taken? No. The only deposition that was taken in this case was the deposition of the plaintiff, which I took. And again, with regard to, you know, we talk about frequency, severity, and whether it was physically threatening. And the interference with the job, again, Lieutenant Copeland performed his job. I'm not aware of anything in the record that indicates he had trouble doing his job. The subordinates that were misgendering him, I asked him if he ever wrote them up, ever disciplined them. No, he didn't. He could have done, you know, a lot of that. But there was no... Yeah, that's, I mean, that's honestly, I mean, I've said this before. That's the strangest part of this case to me is that you have the prison saying, our policy is going to be that the prison guards refer to Copeland as Sergeant or he, him. And then Copeland's subordinates aren't doing that. You know, it's Copeland's job to handle his own subordinates, right? That's correct. I mean, this isn't a situation where the prison says, I mean, you know, we don't have this policy or we're not supporting. Is there any evidence that the prison wouldn't have supported that, I guess, in the record? None that I'm aware of. I mean, he was the supervisor of these individuals. If he could have, I mean, if he had wanted to write them up or discipline them, he could have. And I asked him in his deposition, did he do that? And he said no. I don't recall without looking whether I asked him why, but, you know, the evidence, again, the evidence is that he was able to do his job. He could have controlled his subordinates. He was promoted. There was some, I think Judge Pryor mentioned the shift in assignments. At the Department of Corrections prisons, the employees have to be ready to work any shift at any time. And he admitted that. That's part, that's policy. Because like everything else, they're full staffed. They have to, you know, fill these positions. And so he acknowledged that he was required to work any shift at any time. So that couldn't, you know, that can't, if you're, if you've agreed to do that, and you know it's possible that you don't have to do that, I don't see how that could be an adverse employment action or anything retaliatory. Well, okay, well, I'm not saying that this is the case here, but what if someone was consistently assigned the least desirable shifts and it's not the most, the least senior employee? I mean, could it, under any circumstances, rise to the level of employment action? You know, I'm not aware of a case that says that. I'd have to think about that. I honestly, I don't believe, if you've agreed to it, I don't believe it can be. I mean, if you've agreed and acknowledged, and this was when he first became employed with the department. This was before any of that came up. If you've agreed to it, I don't see how it could be an adverse employment action, because you know that's part and parcel of your job. It's not adverse. That's just your job. But again, I believe that, you know, the trial court applied the correct standards. He looked at it objectively. You know, he found that there was just no objective basis to hold this to be a hostile work environment, and I believe that should be affirmed. And with regard to the decision makers were, and so I'm asking this. Still on the job? Is he still on the job? The last time he was depositioned, he was injured in an unrelated matter and was out at that time, so I don't know the current status. All right, without any further, unless there's further questions, I appreciate it. Thank you, Mr. Carter. Mr. Barton, you've reserved some time for rebuttal. Thank you, Your Honor. The court is correct. Lieutenant Copeland did report many of these instances, but the problem is that the GDC did absolutely nothing, and I think it's important to note that this is not just about the comments about ma'am on the radio. It's about being referred to and referenced as those terms such as an abomination, or having people in the workplace, and forgive me, mom and the court, say that you have a dildo in your pants, or calling someone it or that. And there were no corrective actions taken, and if you look at appellant's brief from pages 10 to 12, it talks about those interactions with Lieutenant, excuse me, with Correctional Officer Holland, and Lieutenant Copeland explains that after that investigation failed, he lost faith in the system. And to address the court's question, this was not just about, this could not be about religious liberty, because the comments that were related to religion, it was the same person who immediately thereafter threatened to fight Lieutenant Copeland over those same religious beliefs. It was that same person who served in the parking lot of the prison with their firearm looking for Lieutenant Copeland that day. As we indicated previously, there were record incidents almost every single day, but I note that in Allen v. Ambrose Statt, this court has explained that daily incidents are not necessarily required. Similarly, the standard for retaliation, I think this is important to note, we discussed this in the brief, but this court in Monaghan v. Worldpay explained that the standard set forth in Burlington North v. Santa Fe Railway Company, that the standard is, did the conduct, would it have, well might have dissuaded the person from making or supporting a charge of discrimination. And so with regard to those retaliation claims, certainly that conduct would have prevented Lieutenant Copeland from doing so. And so we this is a case that should have gone to a jury and should have gotten past summary judgment, and we respectfully ask that this court reverse and remand to the district court to do so. Thank you. All right. Thank you, counsel. Court will be in recess for 15 minutes.